[Cite as *State v. Mahalli*, 2025-Ohio-1551.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

     Plaintiff-Appellee,        :

                               No. 114300

v.                                      :

SAID MAHALLI,                           :

     Defendant-Appellant.       :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 1, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-687275-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Dominic Neville, Assistant Prosecuting Attorney, *for appellee.*

Andrew S. Pollis, Supervising Attorney, and Jordan Marton and Jane Wiertel, Certified Legal Interns, Milton and Charlotte Kramer Law Clinic, Case Western Reserve University School of Law, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Said Mahalli ("Mahalli") appeals the jury's verdict convicting him of a single count of trespass into a habitation when a person is present or likely to be

present, a fourth-degree felony in violation of R.C. 2911.12(B) and (E). Mahalli argues that the trial court erred in denying his Crim.R. 29 motion. After a careful review of the law and facts, we affirm.

## I. Factual and Procedural History

{¶ 2} Mahalli was the owner of a residential property located at 861 Helmsdale Road in Cleveland Heights, Ohio ("the property"). While several occupants were renting space in the residential property, the county foreclosed on the property. In July 2022, following a sheriff's sale, Maysun Investments LLC ("Maysun") purchased the property. Maysun, through a contractual agreement, designated Realty Now Property Management and its owner, Andrew Weiner ("Realty Now" or "Weiner"), as the managers of the property.

{¶ 3} Weiner testified that after the property was purchased, a representative went to the property to assess it for renting and noted that two of the property's three units were occupied by tenants, who eventually left "maybe a month or two" after the sale but never paid Maysun any rent money. (Tr. 187.) Maysun changed the locks to the home. Despite this, a couple of months later, another set of tenants moved into all three units on the property and when asked, the tenants said that they were paying rent to Mahalli. Weiner testified that it took "several months and extensive efforts" to evict these tenants, estimating that it cost around $1,300 in legal fees and at least eight to ten months of lost rent, in the range of $16,000 to $20,000. (Tr. 190, 221 and 222.)

{¶ 4} Once the eviction of the new tenants was complete, Weiner went to the property and discovered that the tenants had left a dog behind. According to Weiner, "[w]e were trying to work with somebody to get the dog picked up, because the dog was just chained up outside." (Tr. 191-192.) He said that the condition of the home was poor, but that it was "theoretically" in livable condition, citing "running water," "electricity," and an intact roof, but stated that he did not think Maysun "would be able to rent it for very much money[.]" (Tr. 192.) Weiner testified that at this time, the home had been properly secured: "Locks were changed. All the doors were closed. They all latched. We test all the doors. All the windows are closed and locked." (Tr. 192-193.)

{¶ 5} Christopher Tetzlaff, a contracted maintenance worker for Realty Now, testified that on November 6, 2024, he met with court bailiffs to facilitate the eviction of the new set of tenants. Once the tenants had moved out and removed all of their personal property, Tetzlaff secured and locked the property, changing the exterior locks, the common door locks, and securing all inner doors and windows. Tetzlaff also recalled that because the upstairs unit could not be secured with a typical locking method, he built a physical, nonremovable wall, "six and a half feet of three-eighths-inch thick plywood secured to wooden molding with very heavy screws." (Tr. 228.)

{¶ 6} Tetzlaff returned to the property the next day, on November 7, 2024, to check on the dog. The tenant was allegedly going to retrieve the dog, so Tetzlaff was tasked with checking that the dog had been removed from the property. Upon

arrival, he saw a work vehicle in the driveway and observed Mahalli coming out of the house, through "the rear door common entry." (Tr. 231.) He also observed one of the former tenants with Mahalli. Upon further inspection of the premises, Tetzlaff noted "damage to the window that was pried open and the damage to the rear door that looked like it had been hit and, also, the lock blown out." (Tr. 231.) There was a chair below the open window. Tetzlaff took photographs of the scene that he identified at trial, and then called Weiner, who arrived at the scene along with police officers. Mahalli, however, had left by the time Weiner arrived. Upon arrival, Weiner noted that the "side window was broken, and the door to the side door lock was damaged. The door was damaged. And everything in the basement had been removed." (Tr. 195.) He elaborated that the basement had a lot of "miscellaneous stuff, work materials and tools." (Tr. at *id*.) According to Weiner, Mahalli had previously called Realty Now to inform them that he was going to retrieve his items, but was specifically told that he did not have permission to enter the property under any circumstances. (Tr. 222.)

{¶ 7} Officer Antoine Danford ("Ofc. Danford") of the Cleveland Heights Police Department testified that he responded to the scene. He testified that upon arrival, Tetzlaff informed him that two males had been trespassing but had left in their vehicles and showed him the photographs of the license plates that he had taken. Ofc. Danford sent the license plate numbers to dispatch, and both came back as registered to individuals with the last name "Mahalli." He corroborated Tetzlaff's observations of the scene, testifying that he observed

the dining room window was shattered, as if somebody tried to force entry into it. They put a chair — propped a chair on the side of the window. The doorknob to the rear access door was taken off, and it was — there was just trash thrown about the house . . . . We went upstairs to the second floor unit, and I observed damage to the second floor rear access door, where somebody tried to pry it open. And they damaged the wood going around the deadbolt.

(Tr. 257-258.)

{¶ 8} Ofc. Danford stated that he photographed the damage to the property and called a company to remove the abandoned dog from the premises. After completing his report, he spoke to Weiner, who confirmed that he wanted to press charges against Mahalli. At the time, nothing had been reported as taken or missing and Ofc. Danford's report reflected this.

{¶ 9} At the close of the State's case, Mahalli's counsel moved for acquittal pursuant to Crim.R. 29, arguing that the State failed to demonstrate the elements of trespass, and that someone was present or likely to be present in the home.

{¶ 10} Mahalli testified in his own defense. He testified that the property was his "base" where he stored various items related to his work, including work on other properties that he managed. He stated that the flat-roof garage on the property contained his things, including "toilets, sink, bowl, electrical, plumbing, all kind of fitting, plumbing, fitting, PVC." (Tr. 288.) He also stated that he had a "compressor . . . . I had two new windows that I bought, because that window that this guy they claim — I bought two new windows that was upstairs." (Tr. 288.)

{¶ 11} Mahalli testified that in the summer of 2021, one of his tenants informed him that the home had been sold. Mahalli met Uri Gofman, whom he

believed was one of the owners of Maysun, and they had an agreement that Maysun would purchase the property in the foreclosure sale and in exchange, Mahalli paid him $5,000 in cash. Mahalli testified that part of this agreement included Maysun and/or Gofman keeping the house for a "year, year and a half," but Mahalli could still keep his tenants and his property there, and then Mahalli would give him the full amount that he paid in the sheriff's sale. (Tr. 294.) Mahalli testified numerous times that the City of Cleveland Heights specifically went after his properties, and that when the home went into Maysun's name, the City of Cleveland Heights "didn't go after them like they came after us." (Tr. 294.)

{¶ 12} According to Mahalli, nobody at Maysun cautioned him that he could not keep his tenants or personal property at the home and since Gofman was purportedly the owner of Maysun, he believed that Gofman had the authority to allow him access to the home.

{¶ 13} Mahalli testified that prior to November 6 and 7, he entered the property numerous times to fix various issues that his tenants were having with electrical and plumbing. On November 6 and 7, 2024, Mahalli testified that he had gone to the home, but did not force the door open, because one of his tenants had left the door open for him. Mahalli specifically testified that neither he nor his workers broke anything to get into the home and that he specifically had permission from Gofman, as well as one of the tenants, to enter the home. Mahalli speculated that Gofman did not respond to his subpoena because Gofman was federally indicted for committing fraud.

{¶ 14} The jury found Mahalli guilty, and the trial court sentenced him to community-control sanctions. It is from this conviction that Mahalli appeals, assigning the following error for our review.

> The trial court erred in denying Mr. Mahalli's Crim.R. 29 motion for judgment of acquittal.

## II. Law and Analysis

{¶ 15} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." Since Crim.R. 29 questions the sufficiency of the evidence, we apply the same standard of review to a trial court's ruling on a Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial. *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 16} The test for sufficiency requires a determination as to whether the prosecution met its burden of production at trial. *State v. Cottingham*, 2020-Ohio-4220, ¶ 32 (8th Dist.). An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.). Although circumstantial evidence and direct evidence have obvious differences, those differences are irrelevant to the probative value of the evidence, and circumstantial evidence carries the same weight as direct evidence. *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.).

{¶ 17} To convict Mahalli of trespass into a habitation when a person is present or likely to be present, the State was required to prove that Mahalli "by force, stealth, or deception . . . trespass[ed] in a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present." R.C. 2911.12(B) and (E). R.C. 2911.10 provides that for purposes of R.C. 2911.12, the element of trespass is any violation of R.C. 2911.21, which provides that trespass is committed when the offender acts "without privilege." "Privilege" is "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

{¶ 18} On appeal, Mahalli renews the same arguments that his trial counsel raised during trial: (1) the State failed to prove that Mahalli lacked privilege to enter the property and (2) the State failed to prove that at the time of the offense, someone was present or likely to be present at the property.

## A. Lack of Privilege

{¶ 19} Mahalli argues that the only witnesses who could properly establish that Mahalli did not have permission or privilege to enter the premises are the actual property owners, and not a single property owner testified at trial. He argues that without this testimony, the State's evidence fails as a matter of law.

{¶ 20} Mahalli does not cite any case law indicating that *only* the property owner may establish permission or privilege. R.C. 2901.01(A). To the contrary, R.C. 2901.01(A)(12) specifically provides that privilege may be granted in several different ways, one of which includes "bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." Moreover, R.C. 2911.21(E) provides that "land or premises" includes "any land, building, structure, or place belonging to, controlled by, or in custody of another, any separate enclosure or room, or portion thereof." In the context of R.C. 2911.12(B), it has been determined that "the [S]tate was not required to present the testimony of the actual owner. It had to prove that [the defendant] had no privilege to be on the property." *State v. Janson*, 2009-Ohio-3256, ¶ 13 (1st Dist.). This is because "[t]respass is an invasion of the possessory interest of the property, not an invasion of title." *State v. Herder*, 65 Ohio App.2d 70, 74 (10th Dist. 1979). Accordingly, Mahalli's contention that only the property owner may establish privilege is without merit. The State had to prove that the person(s) or entities that held a possessory interest in the property did not give Mahalli the privilege to enter, whether directly or through their agents.

{¶ 21} In the present matter, the jury heard two competing theories. The jury heard Weiner explain that Maysun contracted his company, Realty Now, to manage the property. As Weiner explained, this contractual relationship gave Realty Now control of the property for management purposes, including assessing its condition for rental, managing any current tenants, and making any necessary improvements. Weiner testified that Mahalli was specifically instructed to stay away from the property, and Tetzlaff, Weiner's employee, also testified that he did not believe that Mahalli had permission to enter the property on the date in question.

{¶ 22} The jury also heard Mahalli's explanation, that he had an under-the-table deal with Uri Gofman, whom he believed had the authority to allow him to continue using the property. Mahalli's explanation was somewhat corroborated by the fact that after the original tenants moved out, Mahalli accepted a new set of tenants and collected the rent from them and attended to their maintenance issues. Weiner testified, however, that Mahalli's conduct was not approved and that it took significant effort and time to evict these tenants. The jury also heard that the locks were changed and that when Mahalli was seen in the home, there were pry marks on the doors and windows, as well as a broken window.

{¶ 23} In light of this conflicting testimony, the jury was empowered to believe or disbelieve any of the witnesses. The jury heard each explanation of the circumstances and chose to believe that Mahalli did not have a privilege to enter the property based on the direct and circumstantial evidence as offered during trial indicating that Weiner and/or Realty Now had a possessory interest in the property

and that Mahalli was not given permission to enter and indeed had to enter by force. Viewing the evidence in favor of the State, sufficient evidence existed upon which the jury could have reached this conclusion.

### B. "Present or Likely to Be Present at the Property"

{¶ 24} The second portion of Mahalli's assignment of error contests the trial court's denial of Crim.R. 29 as it relates to the requirement that the State prove that the offense occurred "when any person other than an accomplice of the offender is present or likely to be present" pursuant to R.C. 2911.12(B).

{¶ 25} Mahalli directs us to *State v. Kilby*, 50 Ohio St.2d 21 (1977). *Kilby* involved an aggravated burglary, but the portion of the statute at issue included similar language to the statute herein, "in which at the time any person is present or likely to be present." The *Kilby* Court held that based on the facts presented to the jury, the jury could not reasonably find that "no person was present or likely to be present" at the time of the burglary. *Id*. at 25. It relied on the fact that the subject property was a permanent residence that was "regularly inhabited" and that the family was "in and out of the home on the day in question." *Id*. The *Kilby* victims were visiting with neighbors in close proximity to their home, and the Court described the circumstances as merely "fortuitous" that the home was unoccupied at the time the burglary occurred. *Id*.

{¶ 26} Contrary to Mahalli's assertion, we find *Kilby* distinguishable from the facts of this case, but nevertheless provides guidance on our analysis of this issue. *Kilby* makes clear that the question of whether someone is "present or likely to be

present" is a factual question that is best resolved by the jury. *Id.* at 23 ("The Court of Appeals erred in taking the aggravating element of 'present or likely to be present' out of the province of the jury.").

{¶ 27} Here, the facts are distinguishable. Unlike in *Kilby*, where it was clear that the property in question was regularly inhabited by a family that was merely yards away at the neighbor's home, we can only describe the property in this matter as in a state of flux. Tenants were only evicted the day before Mahalli's trespass — in fact, one of the tenants was with Mahalli at the time that he returned to the house. After the tenants had removed their things, Tetzlaff, on behalf of Weiner and Realty Now, changed the locks and secured the property. Tetzlaff, Weiner, and Mahalli all testified that on the day of the incident, a dog was chained up in the back of the home. Tetzlaff and Weiner testified that items had been left behind in the home.

{¶ 28} On these facts, we find that sufficient evidence existed upon which the jury could have found that someone was "present or likely to be present" at the time Mahalli entered the home. We note that the statute does not require anything other than the fact that a "person" is present or likely to be present; it does not specify that this person has to be an owner or an occupant.

{¶ 29} Mahalli points us to several facts in the record from which a trier of fact may reasonably conclude that someone was *not* "present or likely to be present." Specifically, Mahalli references Realty Now's plans to do slight rehabilitation, Realty Now's "backlog" in their construction schedule, that this home's "history" was unlike any home they had every dealt with, and that Realty Now did not discover Mahalli's

new tenants until months after they moved into the premises. He argues that upon the facts, the jury could not have possibly found that someone was "present or likely to be present" at the home.

{¶ 30} Mahalli ignores, however, that there were sufficient facts upon which the jury could have found that someone was "present or likely to be present." It is reasonable to conclude that a person was or was likely to be present based on the presence of a dog that requires food and water daily. Moreover, Mahalli's testimony indicates that he was aware of the status of the property, that is, Mahalli knew that the property had been foreclosed on and purchased, that Realty Now and/or Weiner had undertaken extensive efforts to remove the current tenants, that they had lost rent in the process, and that the home needed renovation before it could be rented out or re-sold. Moreover, Tetzlaff testified that he *was* there for the specific purpose of checking on the dog and he was able to take photographs of Mahalli on the scene that day. Tetzlaff's actions are also consistent with someone who was not expecting Mahalli to be at the property — he called Weiner immediately, who called the police. On these facts, sufficient evidence existed upon which the jury could conclude that it was likely that someone would be present to take care of the dog, or present to assess the home after the move out, remove excess trash left behind by the tenants who had recently left, begin work on the premises, or any of the other scenarios that can be inferred from the specific facts of this case.

# III. Conclusion

{¶ 31} Having carefully considered Mahalli's arguments and the record before us, we overrule his sole assignment of error and find that the trial court did not err in refusing to grant Mahalli's Crim.R. 29 motion at trial.

{¶ 32} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

EILEEN T. GALLAGHER, P.J., and
WILLIAM A. KLATT, J.,* CONCUR

(*Sitting by assignment:  William A. Klatt, J., retired, of the Tenth District Court of Appeals.)